# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MICHELLE ELAINE MARTIN,<br>Plaintiff, | ) ) ) ) ) | |
| v. | ) ) | **CIVIL ACTION**<br>**NO. 4:15-40128-TSH** |
| CAROLYN W. COLVIN,<br>Acting Commissioner,<br>Social Security Administration,<br>Defendant. | ) ) ) ) ) | |

## REPORT AND RECOMMENDATION

### August 3, 2016

Hennessy, M.J.

The Plaintiff, Michelle Elaine Martin, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying her Disability Insurance Benefits ("DIB"), or, in the alternative, remand to the Administrative Law Judge ("ALJ"). (Docket #12). The Commissioner seeks an order affirming her decision. (Docket #14).

By Order of Reference dated May 13, 2016, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #19), this matter was referred to me for a Report and Recommendation on these two motions which are now ripe for adjudication.

For the reasons that follow, I RECOMMEND that Martin's Motion to Reverse (Docket #12) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #14) be ALLOWED.

I.      BACKGROUND

A.      Procedural History

Martin filed an application for DIB on June 22, 2012, alleging that she had been disabled since August 21, 2010.  (Tr. 172-78).  The application was denied initially and on reconsideration. (Tr. 98, 114).  Following a March 25, 2014 hearing, the ALJ rendered a decision unfavorable to Martin on March 26, 2014, finding that Martin had not been disabled from August 21, 2010, through the date of the decision.  (Tr. 17-26).

On July 21, 2015, the Appeals Council denied Martin's request for administrative review, making the ALJ's decision final and ripe for judicial review.  (Tr. 1-6).  Having timely pursued and exhausted her administrative remedies before the Commissioner, Martin filed a complaint in this Court on September 9, 2015, pursuant to 42 U.S.C. § 405(g).  (Docket #1).  Martin filed the motion for reversal or remand on January 13, 2016, (Docket #12), and the Commissioner filed a cross-motion on February 23, 2016, (Docket #14).

B.      Personal History

At the time she claims she became disabled, Martin was forty-one years old.  (Tr. 34). Martin has an associate's degree from Newbury College.  (Tr. 41-42).  She last worked in 2010 as a respiratory therapist at Harrington Regional Hospital, where she had been employed for approximately ten years.  (Tr. 40-41).  Martin is married and lives with her husband, Chris Martin. (Tr. 38).  They do not have children.  (Id.).

C.      Medical History

On December 21, 2009, Martin was seen at UMass Memorial Hospital for complaints of vertigo, pain, and numbness (Tr. 547-51).  She told hospital staff she had been previously

diagnosed with Ménière's disease and that she had experienced eight episodes of vertigo in eight days. (Tr. 547). She appeared normal upon examination. (Tr. 547-48).

On January 19, 2010, Martin reported to her primary care physician, Dr. Kenneth Guarnieri, M.D., experiencing daily light-headedness, but claimed to have experienced no vertigo in the prior three weeks. (Tr. 392). In February 2010, neurologist Dr. Johnny Salameh, M.D. observed that Martin's neurologic functioning, muscle strength and tone, reflexes, cerebellar functioning, sensation, and gait were all normal. (Tr. 478-81). An EEG performed in May 2010 revealed "left temporal polymorphic theta range slowing," which the reviewing physician noted was "consistent with a partial seizure disorder but not diagnostic of it." (Tr. 559-60). After a follow-up appointment in June 2010, Dr. Salameh largely echoed his February observations. (Tr. 475-77). He added that Martin "denied any loss of consciousness" during her episodes of vertigo and experienced "no double vision, no headaches, no nausea, no vomiting, no hearing problems as well as no pain, numbness or tingling sensation." (Tr. 476). Dr. Salameh continued Martin on Topomax, which had reduced the frequency of her dizzy spells. (Tr. 475).

Martin underwent a three-day study in July 2010 to determine the cause of her frequent episodes of dizziness and vertigo. (Tr. 696-98). During the study, an EEG was performed during Martin's waking and sleeping hours. (Tr. 697). On the third day of the examination, Martin reported an episode of vertigo while playing a videogame. (Tr. 696). The episode lasted ten to fifteen seconds. (Id.). Martin remained standing and did not report any disorientation or confusion during the episode. (Id.). The examining neurologist, Dr. Jayant Phadke, M.D., reported that the results of an EEG during the episode were "completely normal" and that Martin's subjective symptoms were likely the results of a panic episode and not an "ictal process."[1] (Id.).

---

[1] "Ictal" refers to a seizure, stroke, or sudden attack. Dorland's Illustrated Med. Dictionary, 911 (32nd ed. 2012).

In September 2010, neurologist Dr. Nabil Ahmad, M.D. examined Martin and noted she had intact strength and muscle tone, intact sensation, 2-3+ reflexes with downgoing toes, intact coordination, and a normal gait. (Tr. 566-68). Dr. Ahmad noted that the cause of Martin's vertigo episodes remained unclear, but her vertigo was unlikely the result of complex partial seizures. (Tr. 567). Neurologist Dr. Catherine Phillips, M.D. also examined Martin and noted "she is doing better now that she is no longer at work." (Tr. 567-68).

In February 2011, Dr. Fred Arrigg, Jr., M.D. attributed Martin's episodes of vertigo and dizziness to Martin's prior diagnosis of Ménière's disease and history of migraines. (Tr. 288-89). Dr. Arrigg noted a "marked improvement" since Martin started taking Topamax and Zonisamide to treat her migraines. (Id.).

On February 4, 2011, ophthalmologist Dr. Hugh Cooper, M.D. reported that Martin had suffered a "mini stroke" in 2008 which "resulted in left sided weakness and loss of vision in her left eye, which reportedly returned to normal." (Tr. 286). Dr. Cooper noted that a full work-up at the time was negative, but Martin reported "persistent intermittent episodes of vertigo, which occur sporadically lasting one to two minutes and resolve spontaneously." (Id.). He noted that Martin's vertigo had "improved on medication" and found no visual impairments. (Tr. 287).

In April 2011, Martin presented at the emergency room of Harrington Memorial Hospital after a reported episode of vertigo. (Tr. 301-02). An examination returned normal results, with intact orientation, mentation, cerebellar function, motor skills, and sensation. (Tr. 302). The examining physician noted that Martin was "in no distress." (Id.). Her gait was steady, at a normal pace, and without difficulty. (Id.).

In August 2011, after complaining of abdominal pain and bloating, Martin was seen by gastroenterologist Dr. Madan Zutshi, M.D. (Tr. 359). Dr. Zutshi found her symptoms to suggest

Irritable Bowel Syndrome.  (Id.).  Dr. Dean Rodman, M.D. performed a CT scan of Martin's abdomen and pelvis with unremarkable results.  (Tr. 292).

In November 2011, Martin complained to Dr. Guarnieri of left hip pain.  (Tr. 351).  Upon examination, her hip was mildly tender to palpation.  (Tr. 352).  Dr. Marc Camacho, M.D. conducted an x-ray on November 15, 2011 with unremarkable results.  (Tr. 290-91).

In February 2012, Martin told Dr. Guarnieri she was feeling better after receiving steroid injections to treat her hip pain.  (Tr. 348).  Martin reported recurrent episodes of vertigo, back pain, shortness of breath, and elevated heart rate when climbing stairs.  (Id.).  She appeared normal upon examination.  (Tr. 349).  Dr. Guarnieri referred Martin to cardiologist Dr. Sheena Sharma, M.D., who performed an echocardiogram on March 5, 2012.  (Tr. 619).  Dr. Sharma stated that "subtle abnormalities cannot be excluded due to poor image quality," but reported no significant abnormalities.  (Id.).  In a follow-up examination one week later, Dr. Sharma categorized the results as "normal."  (Tr. 347).  She noted that Martin was "moderately overweight," but in "no frank distress."  (Id.).  Later that month, Dr. Sharma administered a cardiovascular stress test using a treadmill, which returned "[o]verall normal" results.  (Tr. 344).

On February 12, 2012, Dr. John R. Knorr, D.O. performed an MRI on Martin's lumbar spine which showed "[n]o focal lumbar disc abnormality."  (Tr. 413-14).  On February 13, 2012, neurologist Dr. Gary Keilson, M.D. examined Martin regarding her vertigo symptoms.  (Tr. 442).  Dr. Keilson noted that Martin had stopped taking Topamax, claiming it caused reflux.  (Id.).  Martin also reported that her prescription for Zonegran "only helped a little bit."  (Id.).  Dr. Keilson noted that studies of Martin's brain, cervical spine, and thoracic spine were all unremarkable and that Martin's sleep apnea responded to CPAP treatment.  (Tr. 443).  Upon examination, he found Martin's motor functioning, strength, coordination, reflexes, and sensation to be normal.  (Id.).

Martin's gait was mildly broad-based, but not ataxic.  (Id.).  In a follow-up examination conducted three months later, Dr. Keilson noted that the cause of Martin's vertiginous episodes remained unclear.  (Tr. 500).  Dr. Keilson opined that Martin "had extensive workup in the past, has seen neurologist [sic] in the past, she has had EEGs and brain scanning and this has all been unrevealing."  (Tr. 499).

In May 2012, Martin received an annual physical examination from Dr. Guarnieri.  (Tr. 340-43).  Martin reported abdominal pain, but denied feeling any other pain, dizziness, weakness, numbness, or symptoms of anxiety or depression.  (Tr. 340-41).  On physical examination, Martin's cranial nerves, deep-tendon reflexes, motor strength, and sensation were all normal.  (Tr. 341-42).  Dr. Guarnieri advised Martin to eat five to six servings of fruits and vegetables and to exercise at least thirty minutes per day on a regular basis.  (Tr. 343).

In July 2012, endocrinologist Dr. Richard Haas, M.D. examined Martin regarding thyroid nodules.  (Tr. 485).  Dr. Haas reported that Martin's thyroid nodules were the result of a "benign multinodular goiter."  (Id.).  He noted that the nodules had decreased in size during the prior two years and reassured Martin that the diagnosis was benign.  (Id.)

Martin saw Dr. Guarnieri for a follow-up examination in November 2012. (Tr. 609-10).  Martin denied experiencing any pain, dizziness, weakness, numbness, or symptoms of anxiety or depression.  (Id.).

In December 2012, Martin received a consultative psychological examination with Dr. David Nowell, Ph.D.  (Tr. 492-98).  Martin reported she was not currently receiving any mental health treatment.  (Tr. 492).  Dr. Nowell noted that Martin had renewed her driver's license and was able to drive, though did so infrequently.  (Tr. 493).  Dr. Nowell noted that Martin managed her finances, but "prefer[red] to have her husband review the details."  (Id.) Additionally, Martin

reported that she could shop for groceries independently, but preferred her husband's company. (Id.).  Her daily routine included feeding animals, watching television, working on the computer, preparing breakfast, and going to doctors' appointments.  (Id.).

Dr. Nowell diagnosed Martin with PTSD and mild depression but reported that Martin "appears to function in the high average range of general ability."  (Tr. 494, 497).  Additionally, he observed that Martin's speech and motor functioning were normal.  (Tr. 494).  Martin achieved a 30 out of 30 on a Mini Mental Status Examination.  (Tr. 495).  Dr. Nowell tested Martin's memory and attention/concentration and her performance fell "in the superior range, well above average for her age."  (Tr. 497).  Her performance was within normal limits for tests measuring her visual perception, scanning, and sequencing.  (Tr. 496-97).  Dr. Nowell surmised that Martin appeared capable of learning new information, "manag[ing] simple to moderate attention/concentration tasks," and accepting supervision.  (Tr. 498).  Dr. Nowell opined that Martin's overall performance might be "below her premorbid best" but "cannot be described as impaired."  (Tr. 497).

In February 2013, Martin was seen again by Dr. Guarnieri.  (Tr. 606-08).  Martin once again denied feeling pain, dizziness, weakness, numbness, anxiety, or depression.  (Id.).

In April 2013, gastroenterologist Dr. Sevant Mehta, M.D. examined Martin regarding her abdominal pain.  (Tr. 489).  Dr. Mehta found her symptoms were likely related to Irritable Bowel Syndrome, but could not offer a definitive diagnosis.  (Tr. 490).

In May 2013, Martin had her next annual physical examination with Dr. Guarnieri.  (Tr. 724).  Martin reported joint pain, muscle pain and weakness, and intermittent numbness in her extremities.  (Tr. 724-25).  Dr. Guarnieri noted that Matin was a "well-developed well-nourished white female in no acute distress" and exactly repeated his physical examination findings and

diagnoses from the previous year.  (Tr. 725-26).  Martin's cranial nerves, deep-tendon reflexes, motor strength, and sensation were normal.  (Tr. 726).  Dr. Guarnieri again advised Martin to eat five to six servings of fruits and vegetables and to exercise at least thirty minutes per day.  (Tr. 727).  In August 2013, Dr. Guarnieri noted that Martin had additional complaints of intermittent abdominal discomfort, but otherwise repeated his May 2013 findings.  (Tr. 721-23).

In November 2013, Martin reported left arm numbness and weakness during a consultative examination with neurologist Dr. Shashidhara Nanjundaswamy, M.D.  (Tr. 737).  Martin underwent an EMG[2] study in December 2013 which showed no evidence of radiculopathy or mononeuropathy.  (Tr. 734).  Dr. Nanjundaswamy reported that Martin's deep tendons were hyperreflexic, she had bilateral clonus, and she tended to fall toward the right with her eyes closed.  (Tr. 739).  Martin's psychiatric, motor, and sensory functions were normal.  (Id.).  Dr. Nanjundaswamy ordered an MRI of Martin's brain and cervical spine.  (Id.).  The brain MRI was negative.  (Tr. 741-42).  The cervical spine MRI showed a mild disc bulge at C5-C6, with mild left foraminal narrowing, but no disc herniation, canal stenosis, or enhancing lesions.  (Tr. 743-44).

Martin saw Dr. Guarnieri again in December 2013.  (Tr. 717-18).  Unlike her previous visits with Dr. Guarnieri that year, Martin did not report any muscle pain, muscle weakness, or numbness.  (Tr. 718).  Dr. Guarnieri reported normal results of his examination.  (Tr. 719).

In December 2013, Dr. Nanjundaswamy reported her November findings to Dr. Guarnieri.  (Tr. 735).  Dr. Nanjundaswamy noted the recent MRI study had been negative for demyelination or compression, but Martin's imbalance "raise[d] the possibility of vestibulopathy."[3]  (Tr. 735-

---

[2] Electromyelogram – a test which is "designed to measure muscle response or electrical activity in response to a nerve's stimulation of the muscle.  The test is used to help detect neuromuscular abnormalities."  (Tr. 22 n.28).

[3] Vestibulopathy is a "disease of the ear with dysequilibrium, oscillopsia, and often hearing loss."  Dorland's Illustrated Med.  Dictionary, 2054 (32d ed. 2012).

36).   She referred Martin to neurologist Dr. Lan Qin, M.D., who administered an EMG to determine a possible cause of Martin's left arm numbness and weakness.  (Tr. 734).  The results of the EMG were normal.  (Tr. 734).

In January 2014, otohinolaryngologist Dr. Richard Gacek, M.D. reported that Martin was "in reasonably good health" and had "no medical morbidities."  (Tr. 747).  He noted that Martin's vertigo had undergone "minor improvement" when treated with meclizine.  (Id.).  A hearing test showed normal hearing in the left ear and low-frequency sensorineural loss in the right ear, consistent with Martin's prior diagnosis of Ménière's disease.  (Tr. 748).  Dr. Gacek prescribed valacyclovir to treat Martin's hearing loss.  (Id.).  Martin reported "no severe episodes of vertigo" during a three-week course of treatment.  (Tr. 746).

D.      State Agency Opinions

In November 2012, a state agency physician, Dr. Elaine Hom, M.D., reviewed the available records.  (Tr. 92-94).  She opined that Martin's medically determinable impairments could reasonably be expected to produce Martin's anxiety, vestibular system disorders and affective disorders.  (Tr. 92).  She also determined that Martin's statements about the intensity, persistence, and functionally limiting effects of her symptoms could be substantiated by the objective medical evidence alone, but did not specify which objective medical evidence did so.  (Id.).  Dr. Hom opined that Martin could occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  (Tr. 93). Additionally Martin could occasionally balance, stoop, kneel, crouch, or crawl.  (Id.).  Dr. Hom stated that Martin did not have manipulative, visual, or communicative limitations.  (Id.).  She noted that Martin should "avoid concentrated exposure" to hazards, such as machinery or heights, but Martin could have "unlimited exposure" to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, and gases.  (Tr. 94).  In March 2013, a second state agency

physician, Dr. K. Malin Weeratne, M.D., reviewed an updated record and agreed with Dr. Hom's assessment. (Tr. 107-09).

In December 2012, a state agency psychologist, Dr. Jon Perlman, Ed.D., reviewed the available record and found Martin's vertiginous syndromes, anxiety, sleep, and affective disorders to be severe. (Tr. 91-92). Dr. Perlman stated that Martin had "medical issues, depressive and anxious symptoms, and a possible cognitive disorder based largely on subjective complaints rater [sic] than objective data produced on memory testing." (Tr. 92). Additionally, he opined that these disorders caused mild restrictions of the activities of daily living, mild difficulty in maintaining social functioning, and moderate difficulty in maintaining concentration, persistence, or pace. (Tr. 91). In March 2013, Dr. Kenneth Higgins, Ph.D., agreed with Dr. Perlman's assessment and added that, despite some difficulty coping, Martin could adapt to minor changes in routine. (Tr. 109-11).

E.    Hearing Testimony

Martin testified at an oral hearing before the ALJ on March 25, 2014. (Tr. 59-79). Martin claimed she had been disabled since August 2010 from a combination of physical and mental impairments, including dizzy spells, balance problems, left-sided numbness and weakness, carpal tunnel syndrome, low back and neck pain, depression, and anxiety. (Tr. 60-63). She noted she left her job as a respiratory therapist in 2010 after suffering a vertiginous episode while performing an arterial blood gas on a patient. (Tr. 65-66). She testified her symptoms had worsened and she now has difficulty in performing everyday tasks and leaving the house. (Tr. 64-66, 74-77).

Martin testified she has suffered left-sided numbness and weakness since her TIA.[4]   (Tr. 62).  She stated she suffered from carpal tunnel syndrome and has difficulty grasping objects with her left, non-dominant hand as a result.  (Tr. 63-64).  She testified she experiences episodes of vertigo which occur intermittently, and dizziness, which she described as constant.  (Tr. 68, 75). Martin claimed to suffer, on average, five episodes of vertigo per week.  (Tr. 69).  She testified that these episodes lasted from ten seconds to three hours.  (Tr. 70).  She claimed that her episodes of vertigo could occur without warning, but admitted that she sometimes drove herself to doctors' appointments despite the risk of an episode while driving.  (Tr. 67).  Martin claimed she needed to rest between two and eighteen hours after each episode.  (Tr. 70).  She disputed Dr. Richard Gacek's report that Martin's treatment with the drug Valacyclovir might be helping with these episodes.  (Tr. 70-72, 746).  She added that he had since taken her off the medication "because it didn't do anything."  (Tr. 73).

Martin noted that she was unable to stand in one position for more than a minute at a time without leaning on something due to dizziness and numbness in her feet.  (Tr. 76).  She testified she needed to shift positions while sitting because of pain in her neck and lower back as well as numbness on her left side.  (Id.).  During an average hour, Martin claimed she needed to stand up and walk for short intervals every fifteen to twenty minutes.  (Tr. 77).  She testified that, when maneuvering around the house, she braced herself on her husband or objects she walked past.  (Id.).

Martin testified that her mental health deteriorated as her physical symptoms worsened. (Tr. 61-62).  She claimed that interacting with other people caused her to become anxious.  (Tr. 64-65).  She noted difficulty sustaining concentration as a result of her dizziness.  (Tr. 75-76).  She

---

[4] Martin suffered a Transient Ischemic Attack (TIA) sometime prior to November 2009.  (Tr. 397) (referring to Martin's history of TIA, report dated Nov. 17, 2009).  The exact date of the TIA is unclear upon cursory examination of the record.  A TIA is a brief disruption of blood flow to the brain, often referred to as a "mini-stroke." (https://en.wikipedia.org/wiki/Transient_ischemic_attack) (Last visited June 24, 2016).

testified that she also has difficulty multi-tasking, noting that, when walking, she has to "concentrate so hard on trying ... to not fall" that she "can't really walk and have a conversation at the same time." (Tr. 79).

Martin's husband, Christopher A. Martin, also testified before the ALJ on March 25, 2014. (Tr. 38-59). Martin's husband testified that Martin had been a respiratory therapist until 2010 when she suffered an incident at work and had not worked full-time since.[5] (Tr. 40, 46). Martin's husband stated that Martin had been incapable of performing household chores from 2010 to present and that he performed many of the household responsibilities, including cooking, cleaning and laundry. (Tr. 56).

Martin's husband testified that Martin was "dizzy on her feet" and suffered from episodes of vertigo. (Tr. 46, 52). He noted that Martin's dizziness "is something that's kind of always there at any given time." (Tr. 56). He added that Martin could not perform jobs where people walked by or where objects moved, as on an assembly line, because she would become dizzy. (Tr. 50). He noted that Martin would not be able to sit in a chair "the whole time" while working. (Id.). He added that Martin would need to "get up and walk around." (Tr. 51). Martin's husband also testified that Martin required his assistance on a daily basis when maneuvering around the house. (Tr. 54). He testified that Martin occasionally drove herself to doctor's appointments. (Tr. 57). He noted that Martin's antidepressants and sleep medications were beneficial. (Tr. 58).

Additionally, Martin's husband submitted an Adult Function Report, in which he claimed that Martin's ability to lift, squat, bend, stand, reach, walk, and kneel was restricted, and he opined that her condition was in decline. (Tr. 248-55).

---

[5] Martin's husband described the incident which led Martin to leave her position in 2010 as a TIA. (Tr. 42). There is no record of a second TIA beyond that suffered by Martin prior to 2009. Christopher Martin's description of the incident in 2010 is similar to Martin's description of an episode of vertigo she had in 2010 while administering an arterial blood gas to a patient. (Compare Tr. 42-43, with Tr. 65-66).

Elaine Cogliano, a vocational expert, also appeared at the hearing on March 25, 2014 and testified as to Martin's past relevant work and other substantial gainful activities available to Martin. (Tr. 79-83). The ALJ posed a hypothetical, asking Ms. Cogliano what positions were available to a person capable of light work with the following limitations:

> Would require a sit/stand option at their discretion. Could do no climbing, balancing, or crawling. The work would have to be limited to work that involves remembering and carrying out no more than simple instructions. And they would not be able to be exposed to hazardous machinery or unprotected heights.

(Tr. 80-81). Ms. Cogliano answered that the positions of information clerk, office helper, and order clerk would be available to such a person. (Tr. 81). The ALJ then offered a second hypothetical, identical to the first with the addition that only occasional contact with others would be required. (Id.). Ms. Cogliano responded the order clerk position would remain available and that the office clerk positon would remain available but with a reduction in numbers. (Id.). While the information clerk position would not be available, it could be replaced with the position of inspector. (Tr. 81-82). Following the second hypothetical, the ALJ questioned whether these positions would "exist in numbers of at least 100 in Mass and 1,000 in the United States." (Tr. 82). Ms. Cogliano replied that they would. (Id.). Ms. Cogliano further stated that no positions would be available if a person with the above limitations was required to miss more than four days of work per month due to her impairments. (Id.). Additionally, no positions would be available if such a person were off task for more than twenty-five percent of the day due to her impairments. (Tr. 83).

F.      Administrative Decision

In assessing Martin's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled

13

to benefits.  <u>See</u> 20 C.F.R. § 404.1520; <u>Goodermote v. Sec'y of Health & Human Servs.</u>, 690 F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether she is "doing substantial gainful activity."   20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is doing substantial gainful activity, the ALJ will find that she is not disabled.  <u>Id.</u>  The ALJ found that Martin had not engaged in substantial gainful activity since August 21, 2010.  (Tr. 19)

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe."   20 C.F.R. § 404.1520(a)(4)(ii).  The ALJ determined that Martin had the following severe impairments: migraine headaches, Ménière's disease, vertigo, status post transient ischemic attack (TIA), anxiety, carpal tunnel syndrome, depression, and obstructive sleep apnea (OSA).  (Tr. 19).  The ALJ acknowledged that Martin had also been diagnosed with post-traumatic stress disorder and hyperlipidemia, but did not find these conditions to be severe.  (Tr. 19-20).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled.  <u>Id.</u>  The ALJ found that Martin did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment.  (Tr. 23).

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment,"

the ALJ must determine the claimant's RFC.  20 C.F.R. § 404.1520(e).  An individual's RFC is

her ability to do physical and mental work activities on a sustained basis, despite limitations from

her impairments.  20 C.F.R. § 404.1545(a)(1).  Here, the ALJ found:

> [Martin] has the residual functional capacity to perform light work[6] as defined in
> 20 CFR 404.1567(b) except she would require a sit/stand option at her discretion,
> could not crawl nor be exposed to hazardous machinery or heights, and could have
> only occasional exposure to others and remember and carry out simple instructions.

(Tr. 24).  The ALJ determined that Martin's RFC precluded a return to any past relevant work.

(Tr. 25).

At the fifth step, the ALJ asks whether the claimant's impairments prevent her from

performing other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  The ALJ

determined that, based upon her RFC and the testimony of the vocational expert, jobs exist in

significant numbers in the national economy that Martin could perform.  (Tr. 25).  Accordingly,

the ALJ found that Martin was not disabled at any time from August 21, 2010, through March 26,

2014.  (Tr. 26).

## II.     STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42

U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings where they are

---

[6] "Light" work:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects
> weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or when it involves sitting most of the time
> with some pushing and pulling of arm or leg controls.  To be considered capable of performing a
> full or wide range of light work, you must have the ability to do substantially all of these activities.
> If someone can do light work, we determine that he or she can also do sedentary work, unless there
> are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of
> time.

20 C.F.R. § 404.1567(b).

supported by substantial evidence and the Commissioner has applied the correct legal standard. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991). The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence. Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (citing Sprague v. Dir., Office of Workers' Comp. Programs, U.S. Dept. of Labor, 688 F.2d 862, 865 (1st Cir. 1982)) . Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act. Bowen v. Yuckert, 482 U.S. 137, 146 (1987). The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process. Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982). This includes the burden of establishing his or her RFC. 20 C.F.R. § 404.1512(c). At step five, the Commissioner has the burden of identifying specific jobs in the national economy that the plaintiff can perform. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

III.    ANALYSIS

A.     Weight Given to the Primary Treating Physician's Opinion

Martin argues that remand is appropriate because the ALJ gave no weight to the opinion of Martin's primary treating physician, Dr. Guarnieri, as expressed in a questionnaire which

assessed Martin's ability to perform work-related activities, rendering the ALJ's RFC assessment flawed. (Docket #13 at 9). The ALJ gave this questionnaire no weight and described it as "conclusory, bereft of explanatory narrative, and flatly inconsistent with every one of [Dr. Guarnieri's] other reports." (Tr. 23). The ALJ noted inconsistencies between the questionnaire, Dr. Guarnieri's own treatment notes, and the medical opinions of eight specialists. (Tr. 20-23). Martin argues that remand is appropriate because the ALJ did not identify which evidence contradicted Dr. Guarnieri's questionnaire and the ALJ "dissect[ed] the treatment records" to find contradictory evidence. (Docket #13 at 10-12). I do not agree.

The ALJ may grant controlling weight to a treating physician's opinion on the severity of his patient's disability where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)). Little or no weight may be given to the treating physician's opinion if it is "internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." Id.; see also Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994) (holding ALJ may reject opinion of treating physician if opinion is not supported by specific findings). If the ALJ does not give controlling weight to the treating physician's opinion, he must consider the following factors when determining how much weight to give to the opinion: the length, nature, and extent of treating relationship; the opinion's supportability and consistency with the record as a whole; the physician's area of specialization; and other relevant factors. Arruda, 314 F. Supp. 2d at 72; 20 C.F.R. § 404.1527(c). The ALJ is not required to discuss each factor "so long as the ALJ's decision makes it clear that these factors were properly considered." Delafontaine v. Astrue, No. 1:10–cv–027–JL, 2011 WL

53084, at *14 (D.N.H. Jan.7, 2011); see Healy v. Colvin, No. 12-30205-DJC, 2014 WL 1271698, at *14 (D. Mass. Mar. 27, 2014).

Martin argues that the ALJ incorrectly gave no weight to a two-page questionnaire submitted by Dr. Guarnieri on March 14, 2014 which evaluated Martin's ability to perform general work related tasks.  (Docket #13 at 9).  Throughout this questionnaire, Dr. Guarnieri checked boxes for the most, or second most, severe functional limitations available.  (Tr. 687-88).  The findings contained in the questionnaire are as follows: Martin could not sit or stand without changing position for more than five minutes; every five minutes, Martin needed to walk around for five minutes; Martin could never twist, stoop, or crouch and could only occasionally climb stairs; Martin needed to lie down at random intervals (Dr. Guarnieri did not estimate how often); Martin's ability to reach, push, pull, feel, and manipulate objects was "significantly limited"; Martin needed to avoid all exposure to heat, cold, humidity, fumes, odors, dusts, gases, perfumes, soldering fluxes, solvents, and chemicals; and "all" work-related activities were affected by Martin's impairments.  (Id.).  Finally, Dr. Guarnieri indicated that Martin would need to miss more than four days of work per month—the most frequent absence option available on the questionnaire.  (Tr. 688).

Throughout the questionnaire, Dr. Guarnieri was asked to indicate what medical findings supported the boxes he had marked.  (Tr. 687-88).  In bold, capital letters, the form tells the treating physician filling out the form to "relate particular medical findings to any reduction in capacity."  (Tr. 687).  Dr. Guarnieri merely noted that Martin suffered "multiple medical conditions," and when asked to relate specific medical findings to support his opinion, Dr. Guarnieri wrote "see medical records."  (Tr. 687-88).  Dr. Guarnieri provided no further detail to support his findings.  (See id.).

Martin argues that the ALJ was "not at liberty to ignore" the questionnaire provided by Dr. Guarnieri.  (Docket #13 at 11-2) (quoting <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999)).[7] She claims that remand is appropriate because the ALJ did not identify which evidence he found to be inconsistent with the questionnaire.  (Docket #13 at 11); <u>see</u> <u>Washington v. Shalala</u>, 37 F.3d 1437, 1440 (10th Cir. 1994) (holding ALJ must show good cause for rejecting opinion of claimant's treating physician).  This ignores the ALJ's decision.  The ALJ stated that the questionnaire was "flatly inconsistent with every one of [Dr. Guarnieri's] other reports" (Tr. 23), and discussed three physical examinations conducted by Dr. Guarnieri between May 2012 and December 2013, the results of which cannot be squared with Dr. Guarnieri's questionnaire. (Tr. 20-22).  For instance, on May 29, 2012, Dr. Guarnieri described Martin as a "well-developed well-nourished white female in no acute distress" and advised her to "exercise at least 30 minutes per day on a regular basis." (Tr. 341, 343).  It is impossible to reconcile this advice with the severe functional limitations assessed in Dr. Guarnieri's questionnaire. (Tr. 688).  For instance, although Dr. Guarnieri indicated in his questionnaire that Martin could never twist, stoop, bend, crouch, climb stairs, or lift more than ten pounds, it is hard to imagine exercises (which Dr. Guarnieri advised Martin to take daily four times between January 2010 and May 2013) as not requiring these very same activities.  (Tr. 343, 363, 394, 727).

On February 22, 2013, Dr. Guarnieri examined Martin and noted no clinical deficits.  (Tr. 606-08).   Additionally, Dr. Guarnieri provided a lengthy, though not exhaustive, history of Martin's previous medical tests and examinations, all of which had either been normal, unremarkable, or required no follow-up.  (Tr. 606).  On December 5, 2013, Dr. Guarnieri again found no clinical deficits upon examination and repeated his observation that Martin was a "well-

---

[7] Plaintiff incorrectly cites <u>Rose v. Shalala</u>, 34 F.3d 13, 18 (1st Cir. 1994) for this language.

developed well-nourished white female in no acute distress." (Tr. 717-20).  There is no indication Dr. Guarnieri ever observed Martin in a state of distress that might justify the severe limitations he selected in the questionnaire.  (See Tr. 340-43, 361-64, 392-94, 724-27).

But the ALJ did not limit his findings to internal inconsistencies between the questionnaire and Dr. Guarnieri's prior reports.  The ALJ also noted that the questionnaire could not be reconciled with the medical opinions of the following eight specialists: Dr. Arrigg found Martin's migraines to have improved with medication (Tr. 20, 288); Dr. Cooper found Martin's vision to have returned to normal after her TIA, and a full workup returned normal results (Tr. 20-21, 286-87); Dr. Camacho conducted an x-ray which showed a "normal pelvis and left hip" (Tr. 21, 291); Dr. Rodman performed a CT scan of Martin's abdomen and pelvis which showed normal or unremarkable results (Tr. 21 n.14, 292); Dr. Knorr performed an MRI of Martin's lumbar spine which showed "no focal lumbar disc abnormality" (Tr. 21, 413-14); Dr. Haas diagnosed benign thyroid disease (Tr. 21, 485); Dr. Qin administered an EMG which returned normal results (Tr. 22, 734); and Dr. Gacek reported Martin had suffered no severe episodes of vertigo during a three week period while on medication (Tr. 22, 746).  All of these examinations occurred during the period that Martin claims to have been disabled and none supports the severe limitations Dr. Guarnieri assessed in the questionnaire. (Id.).  The ALJ's allocation of no weight to Dr. Guarnieri's questionnaire is well supported by the inconsistencies found between Dr. Guarnieri's questionnaire, Dr. Guarnieri's own treatment notes, and the medical opinions of the specialists highlighted above.  See Castellano, 26 F.3d at 1029;  see Correia-Pires v. Astrue, No. 10–10724–DPW, 2011 WL 3294903, at *6 (D. Mass. July 29, 2011) (finding ALJ's allocation of no weight to treating physician's opinion acceptable because opinion was contradicted by no less than four other physicians)

As the ALJ noted, Dr. Guarnieri's questionnaire contains no explanatory details, narrative, or findings that might overcome these inconsistencies. (Tr. 686-87). Dr. Guarnieri's suggestion that reviewers "see medical records" to determine which "multiple medical conditions" Martin suffers is not sufficient support for the severe limitations Dr. Guarnieri reported. See Coggon v. Barnhart, 354 F. Supp. 2d. 40, 58 (D. Mass. 2005) (affirming ALJ's allocation of "lesser weight" to medical opinion because it was "unsupported by clinical evidence"). If anything, as noted above, the medical records squarely undermine Dr. Guarnieri's questionnaire assessment. Because medical reports, such as Dr. Guarnieri's questionnaire, containing "brief conclusory statements or the mere checking of boxes" are "entitled to relatively little weight," the ALJ did not err by giving no weight to an opinion contradicted by Dr. Guarnieri himself and eight other specialists. Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991).[8]

Martin next argues the ALJ gave an inappropriate weight to Dr. Guarnieri's questionnaire because the ALJ attempted to "dissect[] the treatment records" to find inconsistencies with the questionnaire, and failed to account for Martin's many medical diagnoses and her self-reported symptoms when assessing Martin's RFC.[9] (Docket #13 at 11). In essence, Martin asks this court to re-examine her treatment records and reweigh the evidence in the hope that this court will discard the inconsistencies found by the ALJ. This I cannot do. Weighing the evidence is the

---

[8] I recognize that the ALJ discusses contradicting medical opinions in a section of his decision separate from his discussion of weight allocation. If error, I do not find this to be material. The ALJ's discussion of the medical evidence precedes the ALJ's discussion of weight allocation by less than a page and "there [was] no mystery as to what the ALJ was referring" when he found Dr. Guarnieri's questionnaire to be "[flatly inconsistent" with the record. Lobov v. Colvin, No. 12-cv-40168-TSH/DHH, 2014 WL 3386567, at *12 (D. Mass. June 23, 2014) (holding ALJ's discussion of claimant's longitudinal history in separate section was sufficient support for ALJ's allocation of no weight to treating physician's opinion). "It would be a needless formality to have the ALJ repeat substantially similar factual analyses" at different steps in his decision. Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004)); see also Knapp v. Sec'y of Health & Human Servs., 810 F.2d 315, 316 (1st Cir. 1987) ("[w]e read the [ALJ's] opinion as a whole").

[9] It appears that Plaintiff's counsel inadvertently copied this argument from a brief in another case, (see Case No. 3:13-cv-30077-MAP; ECF Document #17), as she refers to an individual whose name does not appear in this record (Docket #13 at 11). Regardless, I treat this argument as substantive.

province of the ALJ.  Irlanda Ortiz, 955 F.2d at 769 ("the resolution of conflicts in the evidence is

for the Secretary, not the courts").  I must affirm the ALJ's decision if it is supported by substantial

evidence.  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996);

Ward, 211 F.3d at 655.  This is true even if a reasonable mind could come to a different conclusion.

Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).  As discussed

above, the ALJ found inconsistencies between Dr. Guarnieri's questionnaire and Dr. Guarnieri's

own treatment records, as well as the medical opinions of eight specialists.  (Tr. 20-23).  These

inconsistencies are ample evidentiary support for the ALJ's conclusions, even if this court, upon

reviewing the record de novo, were to disagree.  See Rodriguez Pagan, 819 F.2d at 3.  As the ALJ's

decision is supported by substantial evidence, and because Martin does not argue the ALJ applied

an incorrect legal standard, the ALJ's findings of fact are conclusive.  Manso-Pizarro 76 F.3d at

16.

Next, Martin argues that remand is necessary because the ALJ ignored Martin's diagnoses

of TIA, hyperlipidemia, vertigo, anxiety, depression, carpel tunnel syndrome, malaise/fatigue,

muscle pain, intermittent numbness in her extremities, and psychogenic pain, as well as her self-

reported symptoms of persistent left hip pain, low back pain, stress urinary incontinence, stroke

like symptoms, vertigo, and unsteady gait.  (Docket #13 at 10).

As Martin points out, the ALJ's findings of fact are not conclusive if "derived by ignoring

the evidence."  (Docket #13 at 12) (quoting Nguyen v. Chater, 172 F.3d at 35).  Had the ALJ

ignored the diagnoses and symptoms mentioned above when assessing Martin's RFC, remand

would be appropriate, but the record shows he did not do so.  See 20 C.F.R. § 404.1529(c)(1-3)

(requiring ALJ to consider objective medical evidence and information provided by the claimant

when assessing intensity and persistence of claimant's symptoms).  To the contrary, at step two of

his analysis, the ALJ identified eight separate severe impairments which expressly capture the very diagnoses Martin claims the ALJ ignored.[10]   (Tr. 19).   Although he found these diagnoses to be severe, "a diagnosis . . . standing alone, does not establish the severity of the disease nor the limitations that result for a particular individual."   Dowell v. Colvin, No. 2:13–cv–246–JDL, 2014 WL 3784237, at *3 (D. Me. July 31, 2014).

Similarly, the ALJ did not ignore Martin's self-reported symptoms.   Rather, he found "the claimant's assertions regarding the severity of her symptoms less than fully credible" because "extensive objective testing failed to produce an illness that would explain the severity of Martin's self-reported symptoms."[11]   (Tr. 23); see also Irlanda Ortiz, 955 F.2d at 769 (holding while claimant suffered an objective medical impairment that could reasonably be expected to produce pain, ALJ did not err in finding claimant's complaints not credible to extent alleged).   "An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted."   Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008); see Lill v. Astrue, 812 F. Supp. 2d 95, 105 (D. Mass. 2011) (affirming ALJ's disregard for treating physician's opinion which overly relied on self-reported symptoms, given claimant's low credibility).   Martin does not contest the ALJ's credibility assessment and "[i]nasmuch as the administrative law judge did not have to accept [claimant's] testimony, he did not have to credit the expert testimony that was predicated upon it."   Craigie v. Bowen, 835 F.2d 56, 57-58 (3d Cir.

---

[10] The ALJ did not find Martin's diagnoses of hyperlipidemia and PTSD to be severe.   (Tr. 19-20).   The ALJ noted that the symptoms of PTSD were largely covered in his RFC analysis, which accounted for Martin's anxiety.   (Tr. 19).   The ALJ also did not consider Martin's benign thyroid disorder to be severe.   (Tr. 21 n.20).

[11] The ALJ also noted that "[t]he claimant's conduct in driving a car persuades me that her vertigo is not as severe as she says it is." (Tr. 23).   While it was not improper for the ALJ to at least consider the tension between the randomness of Martin's vertiginous episodes and her use of a car, engaging in speculation can be troubling.   McCollom v. Astrue, No. 11–30079–KPN, 2012 WL 2244798, at *6 n.1 (D. Mass. June 14, 2012).   In any case, the ALJ's credibility assessment rests on the normal results found in Dr. Guarnieri's treatment notes and the medical opinions of the specialists highlighted.   (Tr. 23).   As Martin does not contest the ALJ's credibility assessment, I accept it.

1987).  Accordingly, the ALJ did not ignore Martin's diagnoses and self-reported symptoms and ultimately did not err in fully discounting Dr. Guarnieri's questionnaire.

B.      Spouse's Testimony

Martin next argues that the ALJ disregarded the testimony offered by Martin's husband when assessing Martin's RFC.  (Docket #13 at 13).  The ALJ must consider all relevant evidence in the record, including lay evidence.  20 C.F.R. § 404.1513(d)(4); 20 C.F.R. § 404.1529(c)(3); Page v. Astrue, No. 08–cv–340–JD, 2009 WL 700148, at *4 (D.N.H. Mar. 16, 2009).  The claimant's family members may offer testimony regarding the severity of the claimant's symptoms and the claimant's ability to work.  20 C.F.R. § 404.1513(d)(4).  Because symptoms "are subjective and difficult to quantify," the ALJ must consider symptom-related limitations and restrictions reported by the claimant or other persons.  20 C.F.R. § 404.1529(c)(3).  Although the ALJ is required to consider all relevant evidence, and failure to consider a spouse's testimony regarding the severity of the claimant's symptoms is error, Page, 2009 WL 700148, at *4, the ALJ is not required to "directly address[] in his written decision every piece of evidence submitted by a party."  NLRB v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999).

Martin's husband's testimony consists of oral testimony offered at the hearing and an Adult Function Report submitted on February 7, 2013.  In all material respects, the testimony of Martin and her husband were substantially identical.[12]  Martin's husband testified that Martin could not work because she suffered recurring spells of dizziness and vertigo.  (Tr. 47, 52).  He testified that Martin required assistance in everyday activities and would drive only if no one was available to assist her.  (Tr. 57).  In the Adult Function Report, Martin's husband claimed that Martin's ability

---

[12] If anything, Martin herself objected that her husband's testimony did not address all her symptoms.  (Tr. 61).

to lift, squat, bend, stand, reach, walk, and kneel was restricted and he opined that her condition was in decline.  (Tr. 253).

The ALJ directly addressed the testimony offered by Martin's husband, stating "[t]he claimant and her husband, Chris Martin, both testified.  They both said they felt the claimant's dizziness would preclude all SGA."  (Tr. 22).  Because the testimonies of Martin and her husband were largely similar, he addressed the credibility of Martin's and her husband's testimonies jointly.  (Tr. 23).  The ALJ found their collective testimony "less than credible," but noted that Martin's dizziness and vertigo were ongoing issues.  (Tr. 20, 23).  Despite his credibility assessment, the ALJ reasonably accounted for testimony of Martin's husband in his RFC assessment.  The ALJ restricted Martin to light work that did not require her to be exposed to hazardous machinery or heights and allowed her to sit or stand at will.  (Tr. 24).  The ALJ was not required to further explain his treatment of the testimony offered by Martin's husband.  See NLRB v. Beverly Enters.-Mass., Inc., 174 F.3d at 26.  On this record, it cannot be said, as Martin now claims, that the ALJ disregarded her husband's testimony.   Rather, the record shows that the ALJ weighed the testimony and factored the limitations Martin's husband identified into the ALJ's RFC assessment.

Moreover, even assuming arguendo that the ALJ somehow erred in his treatment of the testimony offered by Martin's husband, such error would be harmless where the record substantially conflicts with the offered testimony.  Fedele v. Astrue, No. 08–cv–520–JD, 2009 WL 1797987 at *5 (D.N.H. June 23, 2009) (finding ALJ's failure to give reasons for disregarding claimant's husband's testimony to be a harmless error when testimony conflicted with the medical record).  The plaintiff bears the burden of showing that an error committed by an ALJ was harmful.  See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) (holding that party attacking agency decision carries burden of showing error in administrative proceeding was harmful).

Here, Martin's husband's testimony cannot be squared with Martin's medical history, in which Dr. Guarnieri and eight specialists returned normal and unremarkable results on numerous occasions. Rather, insofar as it mirrors Martin's testimony, Martin's husband's testimony, like her own, is "less than credible," and "after extensive objective testing, no illness that would reasonably produce symptoms with the degree of severity the claimant described has been established." (Tr. 23). Martin does not contest this assessment. (See Docket #13 at 12-13). Both Martin and her husband testified as to the severity of Martin's spells of dizziness and vertigo and her ability to perform everyday tasks. (Tr. 38-59, 60-79). To the extent that their testimony is similar, the inconsistencies noted by the ALJ between Martin's testimony and the objective medical evidence are also applicable to the testimony of her husband. Even if the ALJ failed to adequately consider the testimony of Martin's husband, which I do not find, such an error would be harmless where the record substantially conflicts with the offered testimony, as it does here. Fedele, 2009 WL 1797987 at *5.

Additionally, Martin has failed to show how further consideration her husband's testimony would alter the ALJ's RFC assessment. See Shinseki v. Sanders, 556 U.S. at 409. The testimony offered by Martin's husband provides no additional information regarding Martin's impairments beyond that found in Martin's own testimony. (Compare Tr. 38-59, with Tr. 59-79). The ALJ has already weighed the objective medical evidence against Martin's contention that she cannot work because of her recurring spells of dizziness and vertigo. (Tr. 23). The ALJ found Martin's testimony to be "less than credible." (Tr. 23). Even so, he considered Martin's ongoing vertigo and dizziness when restricting Martin's RFC to light work that did not require her to be exposed to hazardous machinery or heights and allowed her to sit or stand at will. (Tr. 24). Further consideration of her husband's mirroring testimony does not provide a fulcrum to leverage

26

additional restrictions to Martin's RFC.  See Ramos v. Astrue, No. 10-1220-JAG/BJM, 2011 WL

1311725, at *14 (D.P.R. Mar. 7, 2011) (finding no error in ALJ's evaluation of spouse's statements

where they mirrored claimant's own discredited testimony).  There is nothing in the record or the

briefs submitted to this court that might suggest otherwise.

Accordingly, I do not recommend reversal or remand for further consideration of Martin's

husband's testimony, as doing so would "amount to no more than an empty exercise."  Ward, 211

F.3d at 656.

C.      Vocational Expert's Testimony

Martin argues that the ALJ erred by failing to elicit testimony as to the exact number of

office clerk positions available in the national and regional economies in light of the ALJ's

assessment that Martin was limited to only occasional interaction with others.  (Docket #13 at 14).

At the hearing, the ALJ provided two hypotheticals for the vocational expert to consider.  (Tr. 80-

81).  The first hypothetical assumed a person capable of light work required a discretionary

sit/stand option, and could do no climbing, balancing, or crawling, and could not be exposed to

hazardous machinery or unprotected heights.  (Id.)  Additionally, any work this person did would

be "limited to work that involves remembering and carrying out no more than simple instructions."

(Tr. 80).  In response to this hypothetical, the vocational expert indicated that the positions of

information clerk, office helper, and order clerk would be available to such a person.  (Tr. 81).

The second hypothetical, which accurately reflected the ALJ's assessed RFC, was identical to the

first but with the additional requirement that there be only occasional exposure to others.  (Tr. 24,

81).  In response to the second hypothetical, the vocational expert indicated that the position of

information clerk would not be available but could be replaced by an inspector position.  (Tr. 81-

82).  The order clerk position would remain available, as would the position of office clerk, but,

given the need to have only occasional interaction with others, with a reduction in numbers.  (Tr. 81).

Martin argues that remand is necessary in order to ascertain the number of office clerk positions available in the regional and national markets.  (Docket #13 at 14).  I find the vocational expert's testimony adequately established the number of positions available.  After the vocational expert indicated that the second hypothetical would result in a reduction in numbers for the office clerk position, the ALJ specifically asked whether, in either hypothetical, the positions mentioned by the vocational expert would exist in numbers exceeding one hundred in the Massachusetts economy and exceeding one thousand in the national economy.  (Tr. 82).  The vocational expert responded that these positions would exist in such numbers.  (Id.).  The chronology of this exchange indicates that, even with the reduction in numbers, the office clerk position existed in numbers exceeding one hundred regionally and one thousand nationally.  (See id.).  These numbers are sufficient support for the ALJ's finding that there are significant numbers of positions available to Martin, given her RFC.  See Aho v. Comm'r of Soc. Sec. Admin., No. 10–40052–FDS, 2011 WL 3511518, at *8 (D. Mass. Aug. 10, 2011) ("[i]t would appear that 100 jobs is sufficient to meet the statutory threshold"); Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) ("[w]e do not think that the approximately 110 jobs testified to by the vocational expert constitute an insignificant number").  Accordingly, there is no failure to enumerate the number of jobs in the economy for which Martin, with all restrictions identified in both hypotheticals, would qualify.

Finally, I reject Martin's argument that the ALJ's decision should be reversed or remanded because the ALJ failed to elicit the specific Dictionary of Occupational Titles' codes for the jobs the vocational expert testified were available.  (Docket #13 at 14).  Such specificity is not required. See Pires v. Astrue, 553 F. Supp. 2d 15, 26 (D. Mass. 2008) (finding vocational expert testimony

sufficient although ALJ did not elicit specific Dictionary of Occupational Titles' codes).   The positions identified by the vocational expert exactly match positions found in the Dictionary of Occupational Titles.[13]   Furthermore, Martin may not on appeal argue that the ALJ's failure to elicit these codes is an error when Martin had the opportunity at the hearing to question the vocational expert to discover the specific codes for these positions and did not do so.   See Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 746 (1st Cir. 1989) (holding ALJ's questioning adequate where claimant had opportunity to examine vocational expert but did not do so).

I find the testimony offered by the vocational expert to be sufficient support for the ALJ's finding that there is a significant number of positions available to Martin in the national and regional economies, given her RFC.   The ALJ's failure to elicit from the vocational expert the exact Dictionary of Occupational Titles' code is not an error that warrants reversal or remand.

IV.    CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that Martin's Motion for Order Reversing Decision of Commissioner (Docket #12) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #14) be ALLOWED.[14]

/S/ David H.  Hennessy
David H.  Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[13] Office Clerk corresponds with DOT 209.562-010 (Office Clerk).  1991 WL 671792.  Inspector corresponds with DOT 609.684-010 (Inspector, General).  1991 WL 684911.

[14] The parties are hereby advised that, under the provisions of Fed.  R.  Civ. P.  72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S.  140 (1985).